# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## LAFAYETTE DIVISION AT HAMMOND

| | | |
|---|---|---|
| TAMAIRA RIDGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:17 CV 8 |
| | ) | |
| INDIANA UNIVERSITY HEALTH | ) | |
| ARNETT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION and ORDER

This matter is before the court on defendant's motion for summary judgment. (DE # 20.) For the reasons identified below, the motion will be granted.

## I.  BACKGROUND

### A.  *Factual Background*

Plaintiff Tamaira Ridge was an employee of defendant Indiana University Health Arnett, Inc. ("IUHA") from September 1999 until her termination in August 2015. (DE # 1 at 1; DE # 22-7 at 3.) IUHA includes a hospital and several specialty physician practices that are administratively managed by practice managers. (DE # 22-7 at 2.) In 2008, plaintiff was promoted to practice manager. (DE # 22-2 at 70.) The following undisputed factual allegations form the basis of plaintiff's present claims of sex discrimination and hostile work environment.

### 1.  Dr. Desy's Comment on Plaintiff's Shoes

In 2011, Dr. Alain Desy told plaintiff, in reference to her high heeled shoes, "I see you've got your fuck-me shoes on today." (DE # 22-1 at 38.) Plaintiff informed her

supervisor, William Waggoner, of the comment and Waggoner told her that he would follow-up. (*Id.* at 39-40.) After this incident, Dr. Desy never made any similar comments to plaintiff.[1] (*Id.* at 40.)

### 2. Leffew's Comments on Plaintiff's Clothes

Between August 2012 and September 2013, Theresa Leffew supervised plaintiff. (DE # 22-7 at 3.) During this period, Leffew observed plaintiff wearing very tight, low-cut clothing. (DE # 22-4 at 4.) Leffew also received complaints from other practice managers that plaintiff was not dressed appropriately for the workplace. (*Id.* at 5.) In plaintiff's 2012 performance evaluation, Leffew noted that plaintiff "[m]ay also want to ensure professional attire is always exhibited in the workplace." (DE # 22-2 at 49.) When plaintiff asked Leffew what was wrong with her clothing choices, Leffew told her that she is "quite busty" and "curvy." (DE # 22-1 at 12.) Leffew told plaintiff that she needed to be known for her brains and not her beauty, and needed to dress appropriately for the workplace. (DE # 22-1 at 14; DE # 22-4 at 5.) Plaintiff admits that Leffew did not provide this feedback in a mean-spirited way, but in her role as plaintiff's manager. (DE # 22-1 at 11.)

### 3. Lehe Asks Plaintiff Not to Attend Recruitment Dinners

In February or March 2014, Lori Lehe, an IUHA physician recruiter, asked plaintiff not to attend any recruitment dinner where a recruited physician's wife would

---

[1] Defendant disputes plaintiff's testimony that this statement occurred in 2011, on the basis that Dr. Desy resigned his employment with IUHA in 2009. (DE # 21 at 11.) However, the parties are in agreement that this discrepancy is not material.

be present because plaintiff was single and attractive and the wife might feel uncomfortable knowing that there was going to be a single woman managing her husband on a day-to-day basis. (DE # 22-1 at 42-44.)

4.    Plaintiff is Not Promoted to Administrative Director

Between November 2014 and January 2015, Brian Shockney supervised plaintiff. (DE # 22-7 at 3.) In December 2014, plaintiff applied for a position as administrative director. (*Id.* at 3.) This position required a Masters of Business Administration ("MBA"), which plaintiff did not possess. (*Id.* at 4.) During a department meeting discussing recruitment for the position, Shockney stated that, given the orthopedic doctors' behavioral problems, a man could better manage the group because the doctors were more likely to follow a man's direction. (DE # 22-1 at 28.) The Vice President of Human Resources Koreen Kyhnell was present at the time. (*Id.* at 27.) Despite this comment, plaintiff still believed that the decisionmakers for the position would consider her application evenhandedly. (*Id.* at 28-29.) The position was later filled by James Parsons, a male physical therapist with an MBA. (DE # 22-7 at 3-4.)

5.    Wells Refers to Plaintiff as a "Work Wife"

In 2014, when Human Resources Consultant Rebecca Wells checked in with plaintiff to see how she was doing, plaintiff told Wells that doctors in the orthopedic practice group were being abusive to staff and management. (DE # 22-1 at 34.) Plaintiff told Wells that she did not understand why these doctors believed it was okay to treat her or other staff this way. (*Id.*) Wells told plaintiff, "Well, you're a work wife. They

come in, you're a sounding board. They can vent. They give it to you and then you make it all better, you know. And then they go about their day." (*Id.*) However, Wells relayed concerns about the temper of one of the orthopedic doctors, Dr. Orenstein, to her supervisor. (DE # 22-6 at 2.) IUHA sent Dr. Orenstein and Dr. Hubbard, another orthopedic doctor, to an anger management course as a result of concerns expressed regarding their angry outbursts at work. (DE # 22-8 at 4.)

6.     Plaintiff's Wage Discrimination Claim

In 2009, Patrick Adsit began working as a licensed physical therapist at IUHA. (DE # 22-7 at 7.) In 2010, Adsit was promoted to the position of rehabilitation supervisor. (*Id.*) While Adsit was a rehabilitation supervisor, plaintiff asked Leffew why Adsit was paid more than her. (DE # 22-1 at 63-64; DE # 22-6 at 4.) Leffew told her that Adsit was hired as a physical therapist, a revenue-generating role, and the market pay for a physical therapist is higher than for a practice manager. (*Id.*)

7.     Plaintiff's Termination

In May 2015, plaintiff attended a non-work related charity event. (DE # 22-1 at 49, 53.) During the auction portion of the event, plaintiff "became part of the auction," took off her dress and undergarments, and threw them out to the audience. (*Id.* at 50; DE # 22-3.) She later learned that her dress sold for $1,000. (DE # 22-1 at 53.) She also later learned that this incident had been recorded on video. (*Id.* at 53-54.)

The video was eventually shared with IUHA employees. On August 3, 2015, Vice President of Human Resources Koreen Kyhnell received an email from Human

Resources Consultant Bobbie Shackleferd stating that she had received reports that IUHA employees had been sent text messages containing the video, and titled "Tammy Ridge stripping." (DE # 22-7 at 4.) The video was sent to physicians, managers, and others who worked with, or reported to, plaintiff. (*Id.*) Kyhnell showed the video to Wells. (DE # 28-4 at 9.) Additionally, a practice manager who reported to Leffew showed Leffew a copy of the video. (DE # 22-4 at 3.) The practice manager informed Leffew that the video was "going viral" in the General Surgery department, and employees were asking what was going to be done about plaintiff's "inappropriate behavior." (*Id.* at 3-4.) Leffew directed the practice manager to send the video to James Parsons, plaintiff's supervisor. (*Id.* at 3; DE # 22-7 at 3.) After learning of the existence of the video, Brian Shockney, the chief operating office for IUHA, instructed a supervisor in plaintiff's practice group that any mention or viewing of the video must stop immediately. (DE # 22-5 at 5; DE # 22-8 at 2.)

After discussing the video and its dissemination, Kyhnell and Shockney determined that plaintiff's conduct was not in line with IUHA's expectations of its leaders and they no longer had confidence in plaintiff's ability to carry out her managerial duties effectively.[2] (DE # 22-7 at 5; DE # 22-8 at 3.) They believed plaintiff's conduct was unacceptable for an IUHA leader. (*Id.*) They considered whether their opinions would be different if plaintiff was a man, and determined that they would have reached the same decision. (*Id.*) Kyhnell and Shockney contacted plaintiff's

---

[2] Plaintiff disputes the genuineness of this reason for her termination. (DE # 27.)

5

supervisor James Parsons and the Chief Executive Officer of IUHA regarding their recommendation that plaintiff's employment be terminated. (DE # 22-5 at 3-4.) Both agreed that termination was appropriate. (*Id.*) Kyhnell and Shockney offered plaintiff the choice between termination and resignation with a severance package, and also told her that she could apply for a non-management position with IUHA. (DE # 22-1 at 57; DE # 22-7 at 6.) Plaintiff did not elect the severance, and did not apply for another position within IUHA. (DE # 22-7 at 6.)

      *B.*     *Procedural History*

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on December 15, 2015. (DE # 22-2 at 76.) On January 1, 2017, she filed the present federal action. (DE # 1.) In her complaint, plaintiff alleges violations of Title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963. (*Id.* at 1.) However, plaintiff subsequently conceded that her claims under the Equal Pay Act are untimely. (DE # 27 at 20.) Plaintiff's remaining claims, all under Title VII, are for: (1) hostile work environment; (2) wage discrimination; (3) failure to promote; and (4) discriminatory termination. (*See* DE # 27.)

Defendant has moved for summary judgment on all of plaintiff's claims. This matter is fully briefed and is ripe for resolution.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after an adequate time for discovery, against a party "who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In responding to a motion for summary judgment, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In doing so, the non-moving party cannot rest on the pleadings alone, but must present proof in support of its position. *Id.* at 248. A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).

## III.   ANALYSIS

### A.    Statute of Limitations

Defendant contends that plaintiff's failure to promote claim, claims related to Desy, Leffew, Lehe, Orenstein and Hubbard, and wage discrimination claim, are time-barred. (DE # 21 at 15, 17, 19.) Plaintiff responds that these incidents were part of a

continuing violation, and thus even though they occurred more than 300 days prior to her filing the EEOC Charge, they are nevertheless timely. (DE # 27 at 20-21.)

In Indiana, a Title VII plaintiff must file a charge with the EEOC within 300 days of the occurrence of the challenged employment action. *Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014). Here, plaintiff filed her EEOC charge on December 15, 2015. (DE # 22-2 at 76.) Thus, any discriminatory practice that occurred prior to February 18, 2015, is time-barred. The relevant question, then, is when the challenged practices "occurred."

Contrary to plaintiff's assertion, "there is no general continuing-violation doctrine in the federal law of employment discrimination." *Crum v. Advocate N. Side Health Network*, 733 F. App'x 842, 843 (7th Cir. 2018). Rather, "[e]ach discrete act carries its own period of limitations," and hostile work environment claims are considered to be one cumulative violation. *Id.* To determined whether a Title VII claim is timely, the court must determine whether the incident was a discrete act or is part of a hostile work environment claim. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). While Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period," a hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 105, 122.

"A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within either 180 or 300 days of the

date of the act or lose the ability to recover for it." *Id.* at 110. This is true even if the discrete act is related to acts alleged in timely filed charges. *Id.* at 113. Termination and failure to promote are discrete acts. *Id.* at 114.

A hostile work environment, however, "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. . . . Such claims are based on the cumulative effect of individual acts." *Id.* at 115. "Provided that an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117.

### 1.    Failure to Promote

Plaintiff's failure to promote claim is untimely. Plaintiff applied for the position of administrative director in December 2014, and withdrew her application at some point before James Parsons began working in that role in January 2015. (DE # 22-2 at 68; DE # 22-7 at 3; DE # 28-1 at 5.) This discrete event occurred more than 300 days prior to plaintiff's EEOC Charge, and is untimely. Therefore, IUHA is entitled to summary judgment on plaintiff's failure to promote claim.

### 2.    Allegations Regarding Desy, Leffew, Lehe, Orenstein, and Hubbard

Defendant asserts that plaintiff may not use the statements by Desy, Leffew, or Lehe as part of her Title VII claim because these incidents are unrelated to each other, and are thus time-barred. (DE # 21 at 14.) Defendant does not clarify why it believes these comments should be deemed unrelated. The specific contours of alleged

misconduct, such as "the harassers' identities, whether they acted in concert or isolation, and whether they harassed in distinct or similar fashions are irrelevant to whether the allegations form a single unlawful practice." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 712 (7th Cir. 2017). Here, plaintiff identifies the circulation of the video as an act contributing to her hostile work environment claim. Because this act occurred within the limitations period, and because defendant has not identified any reason why these statements do not form one unlawful practice of harassment, the court will consider these statements as part of plaintiff's hostile work environment claim.

Defendant also argues that evidence of the angry outbursts from Drs. Orenstein and Hubbard should be deemed untimely and not part of plaintiff's hostile work environment claim. (DE # 21 at 15.) Yet, plaintiff does not argue that the behavior of these doctors contributed to her hostile work environment claim. Rather, she references the behavior of these doctors as evidence that IUHA's proffered explanation for her termination – that she failed to meet IUHA's rigorous professionalism standards – is pretext. (*See* DE # 27 at 18.) Because these statements are not part of any of plaintiff's claims, the court need not decide whether the statements are time-barred.

### 3. Wage Discrimination

Finally, defendant argues that plaintiff's wage discrimination claim is untimely because her only male comparator, Patrick Adsit, left employment at IUHA in July 2014, outside the 300-day limitations period. (DE # 21 at 19.) Defendant cites *Snider v. Belvidere Twp.*, 216 F.3d 616, 618 (7th Cir. 2000) for the proposition that a wage

discrimination claim begins to accrue when the comparator leaves a defendant's employment because the comparator's departure ends the discriminatory wage differential. (*Id.*) Yet, *Snider* was decided well before Congress enacted the Lilly Ledbetter Fair Pay Act, which now governs the limitations period for wage discrimination claims. *See* 42 U.S.C. § 2000e-5(e)(3)(A); *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, n. 59 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 82 (2016).

"The [Fair Pay] Act amends Title VII of the Civil Rights Act of 1964 by providing that the statute of limitations for filing an EEOC charge alleging pay discrimination resets with each paycheck affected by a discriminatory decision." *Groesch v. City of Springfield, Ill.*, 635 F.3d 1020, 1024 (7th Cir. 2011). Under the Act, each paycheck that reflects a past "unlawful employment practice" creates a fresh cause of action under Title VII. An unlawful employment practice occurs when: (1) "a discriminatory compensation decision or other practice is adopted;" (2) "an individual becomes subject to a discriminatory compensation decision or other practice;" or (3) "an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." 42 U.S.C. § 2000e–5(e)(3)(A). Because plaintiff was affected by the alleged pay disparity every time she received a paycheck, and she received such paychecks within the limitations period, she may proceed with her wage discrimination claim.

B.      *Hostile Work Environment Claim*

The court now turns to the merits of plaintiff's claims. To survive summary judgment on her hostile work environment claim, plaintiff must establish: (1) her workplace was both subjectively and objectively offensive; (2) her sex was the cause of the harassment; (3) the harassment was severe or pervasive; and (4) there is a basis for employer liability. *Milligan-Grimstad*, 877 F.3d at 713.

Whether conduct is sufficiently severe and pervasive depends on "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Id.* at 714 (internal citation omitted). "The prohibition of harassment on the basis of sex . . . forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment. " *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 472 (7th Cir. 2012) (internal citation omitted). "Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840-41 (7th Cir. 2009). Yet, "'[c]ourts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive.'" *Equal Employment Opportunity Comm'n v. Costco Wholesale Corp.*, 2018 WL 4289379, at *1–8 (7th Cir. 2018) (internal citation omitted).

"[C]onduct demonstrating 'anti-female animus' can support a hostile work environment claim. In other words, a plaintiff can proceed on a claim when the work

environment is hostile because it is 'sexist rather than sexual.'" *Scruggs*, 587 F.3d at 840 (internal citation omitted).

### 1.    Circulation of the Video

Plaintiff's hostile work environment claim centers on the circulation of the video. Her claim relies on both the general circulation of the video by various, unidentified co-workers, as well as the circulation of the video by Leffew and Kyhnell specifically. (DE # 27 at 8-9.)

The circulation of the video fails to meet any of the elements necessary to establish a hostile work environment claim. Leffew, part of IUHA leadership, directed the employee who showed her the video to forward the video to plaintiff's supervisor, James Parsons. (DE # 22-4 at 3; DE # 22-7 at 3.) Kyhnell, the vice president of human resources, showed the video to Rebecca Wells, the human resources consultant who supported plaintiff's practice group. (DE # 28-4 at 9.) No reasonable jury could determine that these managers' circulation of information related to a personnel matter that had "gone viral" throughout IUHA amounted to unlawful harassment. Leffew and Kyhnell's involvement was not objectively offensive, severe or pervasive harassment, or harassment based on plaintiff's sex. The circulation of the video also did not alter the conditions of plaintiff's employment; plaintiff testified that she was "perfectly fine coming in to work" despite the circulation of the video. (DE # 22-1 at 47).

Finally, the circulation of the video fails to establish a hostile work environment claim because there is no basis for employer liability. "[E]mployers are strictly liable for

13

the discriminatory acts perpetrated by supervisors and they are liable for the discriminatory acts of others – coworkers, independent contractors, customers, inmates etc. – only if they are negligent either in discovering or remedying the harassment." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 904 (7th Cir. 2018). In the case of coworker harassment, "[t]he plaintiff bears the burden of showing that the employer knew of the problem and that the employer did not act reasonably to remedy the issue once it had knowledge." *Id.*

Here, plaintiff has not submitted any evidence suggesting that IUHA did not act reasonably to remedy the problem of the circulation of the video once it had knowledge of it. To the contrary, IUHA's Chief Operating Officer, Brain Shockney, and plaintiff's closest supervisor at the time that the video began circulating,[3] immediately instructed employees to stop viewing or mentioning the video. (DE # 22-5 at 5). While plaintiff argues that Shockney's admonition "did nothing to prevent Ridge from being sexually harassed in other ways not directly related to (but still arising out of) the mentioning and viewing of the video" (DE # 27 at 9), she does not explain what she means and at this stage, conclusory allegations are insufficient to survive summary judgment.

### 2.     Miscellaneous Harassment Allegations

It is not clear from plaintiff's brief whether she intended to pursue a hostile work environment claim based on the other, miscellaneous comments identified in her brief –

---

[3] Plaintiff's immediate supervisor, James Parsons, was on vacation at the time the video began circulating. (DE # 22-5 at 3).

or whether she presents those comments solely to provide evidence for her termination claim. Out of an abundance of caution, the court will interpret her brief as doing both.

Plaintiff identifies four incidents of harassment at the hands of various IUHA employees. The incidents are as follows: (1) in 2011, Dr. Desy told plaintiff, "I see you've got your fuck-me shoes on today; (2) during her 2012 performance evaluation, Leffew told plaintiff that she "[m]ay also want to ensure professional attire is always exhibited in the workplace" because she is "quiet busty" and "curvy" and should aim to be known for her brains and not her beauty; (3) in 2014, an IUHA physician recruiter asked plaintiff not to attend any recruitment dinners where a physician's wife was in attendance because the wife might feel uncomfortable knowing that there was an attractive, single woman managing her husband on a day-to-day basis; and (4) in 2014, when plaintiff asked Wells why Drs. Orenstein and Hubbard believed it was appropriate to lash out at her and other staff members, Wells told plaintiff "you're a work wife. They come in, you're a sounding board. They can vent. They give it to you and then you make it all better, you know. And then they go about their day."

No reasonable jury could determine that these comments created a hostile work environment. First, there is no evidence that plaintiff ever relayed the recruiter's comments to anyone in a management position. Thus, there can be no employer liability for this comment. This leaves three comments made over the course of three years – a far cry from pervasive harassment. *See King*, 678 F.3d at 472 ("[A] few incidents at the rate of one every four to six months . . . cannot be called pervasive."). In fact, plaintiff

15

argues that she was not even aware of the harassment or discrimination until after her termination (DE # 27 at 21), thus emphasizing the sporadic nature of the incidents.

The remaining comments were not sufficiently severe to establish a hostile work environment claim. While plaintiff may have found the comments offensive, they were not so severe as to alter the terms of her employment, were not physically threatening, and did not unreasonably interfere with her work performance. *See e.g. Scruggs*, 587 F.3d 841 (plaintiff's supervisor's occasional inappropriate comments, including that she was "made for the backseat of a car," looked like a "dyke," and that he hated "pushy, aggressive women" like plaintiff, were insufficient to establish an objectively hostile work environment). Moreover, plaintiff admits that Leffew did not provide her with feedback regarding her clothing in a meanspirited way, but rather in her capacity as her manager – thus no jury could find the comment to be subjectively offensive.

Finally, there is no evidence that IUHA negligently permitted the harassment to continue. When plaintiff complained to her supervisor William Waggoner about Dr. Desy's comment, Waggoner told her that he would look into the matter. (DE # 22-1 at 39-40.) Plaintiff admits that Dr. Desy never made a similar comment to her again. (*Id.* at 40.) Furthermore, despite Well's comment that the orthopedic doctors treated plaintiff as a sounding board and "work-wife," Wells relayed the concerns to her supervisor and IUHA sent both doctors to anger management classes. (DE # 22-6 at 2; DE # 22-8 at 4.)

For all of the foregoing reasons, IUHA is entitled to summary judgment on plaintiff's hostile work environment claim.

*C.     Discrimination Claims*

To survive summary judgment on her Title VII discrimination claim, plaintiff must present evidence that would permit a reasonable jury to conclude that her sex influenced IUHA's decision to terminate her. *See Milligan-Grimstad*, 877 F.3d at 710.

"[T]he well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson*, 892 F.3d at 894 (internal citations omitted). Under this test, courts evaluate whether plaintiffs: "(1) are members of a protected class; (2) performed reasonably on the job in accord with their employer['s] legitimate expectations; (3) were subjected to an adverse employment action despite their reasonable performance; and (4) similarly situated employees outside of the protected class were treated more favorably by the employer." *Id.* at 895. However, the *McDonnell Douglas* test "is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's race or other proscribed factor." *Id.* at 894 (internal citation omitted). "*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination. In adjudicating a summary judgment motion, the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

If the plaintiff can establish a *prima facie* case of discrimination, the burden shifts

to the defendant to articulate a legitimate, non-discriminatory reason for terminating the plaintiff. *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018). If such a reason is offered, the plaintiff must present evidence that the offered reason is pretext.

1.  Termination

Here, no one disputes that plaintiff is a member of a protected class and that her termination was an adverse employment action. The essence of the parties' dispute is whether plaintiff failed to meet the legitimate expectations of IUHA. IUHA argues that it has high standards for its leaders and expects them to avoid conduct that would hurt the reputation of the company or that could create a situation where leaders could not effectively lead because their peers no longer respect them. (DE # 22-5 at 9-10.) Plaintiff argues that IUHA used her behavior as a pretext for terminating her, and points to other employees who acted unprofessionally, but were not terminated. (DE # 27 at 17-18.) Because IUHA has offered a legitimate, non-discriminatory explanation for terminating plaintiff, and because plaintiff challenges that explanation as pretext, the court will move on to the pretext analysis. *See Khowaja*, 893 F.3d at 1015 ("The similarly situated and pretext analysis often overlap, as comparator evidence and selective enforcement of an employer's rules are relevant to both inquiries.").

"[A] pretext analysis evaluates the honesty of the employer's explanation, not its validity or reasonableness." *Seymour-Reed v. Forest Pres. Dist. of DuPage Cty.*, 2018 WL 4944826, at *3 (7th Cir. 2018). *See also Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010) ("The only question we must ask is whether [defendant] had a

legitimate, nondiscriminatory reason for firing [plaintiff], not whether it made the correct decision."); *Milligan-Grimstad*, 877 F.3d at 710 (even if it is possible that plaintiff was punished too harshly, courts must not act as a "superpersonnel department").

Plaintiff argues that a jury could determine that because she did not conform to IUHA's stereotypes about women, it used her off-duty conduct as a pretext to terminate her and replace her with a man. (DE # 27 at 13.) In support of this argument, she points to the comments by Desy, Leffew,[4] Lehe, and Wells. Yet, these comments are not evidence that Kyhnell or Shockney were motivated by plaintiff's sex. The comments occurred years prior to her termination, thus there is no temporal connection that could permit a jury to infer discriminatory intent. *See Seymour-Reed*, 2018 WL 4944826, at *3 (discriminatory comment by non-decisionmaker a year and a half before plaintiff's discharge was not evidence that employer's reason for discharge was pretext). Moreover, neither decisionmaker made these comments, and there is no evidence that they were aware of the comments. *See id.* ("'[S]tray remarks' do not support an inference of discrimination unless the decisionmaker or someone with influence over

---

[4] Plaintiff also makes an undeveloped argument that Leffew's 2012 notation in her performance review regarding her clothing constituted an adverse employment action. (DE # 27 at 11, 17.) This argument fails to establish a discrimination claim because: (1) it is time-barred; and (2) there is no evidence that the comment constitutes an adverse employment action. "[N]ot every criticism or disciplinary measure is an 'adverse employment action' for Title VII purposes." *Pantoja*, 495 F.3d at 847. A disciplinary measure constitutes an adverse employment action for purposes of Title VII where it affects the plaintiff's "compensation, terms, conditions or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Here, the evidence is that Leffew never disciplined plaintiff for dressing inappropriately at work. (DE # 22-4 at 5.)

the decision made the comment around the time of, or about, the adverse action.").

Plaintiff next argues that IUHA's true motivation for terminating her was to replace her with a man in order to cater to the orthopedic doctors' prejudicial and sexist attitudes toward women. (DE # 27 at 13.) However, the only doctors plaintiff identifies as holding such views are Orenstein and Hubbard, and plaintiff testified that these doctors were equally abusive to men and women. (DE # 22-1 at 41, 73.) Moreover, the statements plaintiff relies on are not evidence that Kyhnell or Shockney terminated plaintiff in order to cater to the views of these doctors. Plaintiff points to: (1) a statement Leffew made to James Parsons that a man might do better as practice manager over the orthopedics group (DE # 28-2 at 5-6); and (2) a conversation Wells overheard, suggesting that plaintiff's position should be filled by a man. (DE # 28-4 at 5.) However, both of these statements occurred *after* plaintiff's termination. (DE # 28-2 at 7; DE # 28-4 at 5). Additionally, Parsons did not make the decision to terminate plaintiff; he was on vacation when Kyhnell and Shockney made this decision. Plaintiff does not identify who participated in, or was present during, the conversation Wells overheard.

Finally, plaintiff argues that a jury could infer discriminatory intent because IUHA terminated her for unprofessional conduct, but did not terminate Drs. Desy, Orenstein, or Hubbard for their unprofessional conduct. (DE # 27 at 17-18.) "In cases in which the employer allegedly enforces job expectations in a disparate manner, we have noted that the 'expectations themselves may be tainted with discrimination,' so the plaintiff needs to show only that he was 'singled out for worse treatment' than similarly

situated employees." *Seymour-Reed*, 2018 WL 4944826, at *3 (internal citations omitted). Where a plaintiff takes this approach, he or she must produce evidence that the defendant enforced one set of expectations upon the protected class and another for members outside of the protected class. *Id.* "Similarly situated means 'directly comparable' in all material respects. . . . 'The similarly-situated inquiry is flexible, common-sense, and factual. It asks 'essentially, are there enough common features between the individuals to allow a meaningful comparison?'" *Johnson*, 892 F.3d at 895 (internal citations omitted). While there is no set formula for determining whether a comparator is similarly situated, some examples of evidence that would be required in the usual case include: "whether the employees being compared (1) were supervised by the same person, (2) were subject to the same standards, and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* (internal citation omitted).

Here, plaintiff's situation is not sufficiently comparable to that of Drs. Desy, Orenstein, or Hubbard to allow a jury to infer that IUHA applied its job expectations in a discriminatory manner. The conduct itself is too different to allow for an inference of discriminatory intent. Plaintiff also does not identify who supervised these doctors, or what the expectations for the doctors were. Thus, it is unclear whether the same members of leadership enforced job expectations in a disparate manner. Finally, IUHA contends that it terminated plaintiff because her behavior impaired her ability to carry out her managerial duties effectively; yet, it is unclear whether these doctors were in a

management position at the time of their unprofessional conduct.

Examining the evidence as a whole, plaintiff presents no evidence that would permit a reasonable factfinder to conclude that she was terminated because she is a woman. She has presented no evidence of sex-based animus by any of the persons involved in her termination. *See Seymour-Reed*, 2018 WL 4944826, at *3 (plaintiff's evidence did not suggest that his employer used performance reasons to cover its discrimination, but merely that he disagreed with his employer's decision). Plaintiff has provided little more than her own suspicions that the reason stated for her termination was not genuinely believed by IUHA's employees, and her own suspicions are not good enough. *See Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997) ("Facts, not an employee's perceptions and feelings, are required to support a discrimination claim."). Thus, IUHA is entitled to summary judgment on this claim.

## 2. Wage Discrimination

Plaintiff's final claim is that IUHA violated Title VII when it paid her less – because of her sex – than one of her male counterparts, Patrick Adsit. (DE # 27 at 20.) IUHA contends that Adsit was compensated differently than plaintiff because: (1) the market rate for licensed clinical employees is different than that for practice managers; (2) Adsit was able to do additional tasks and duties that plaintiff was not qualified to do because he was a licensed clinician; (3) if a practice manager is managing a clinical area, knowledge of the particular speciality practice is particularly valuable; and (4) IUHA does not reduce clinically licensed employees' pay when they move into an

administrative role. (DE # 21 at 12; DE # 22-1 at 63-64; DE # 22-6 at 4; DE # 22-7 at 7.)

Plaintiff does nothing to challenge these proffered reasons for the pay differential, or otherwise demonstrate that she and Adsit were similarly situated in all material respects. "In the employment discrimination context, the requirement to find a similarly situated comparator is really just the same requirement that any case demands—the requirement to submit relevant evidence." *Johnson*, 892 F.3d at 895. Plaintiff has failed to submit relevant evidence that would suggest prohibited discrimination. Thus, IUHA is entitled to summary judgment on plaintiff's wage discrimination claim.

## IV.     CONCLUSION

For these reasons, the court **GRANTS** defendant's motion for summary judgment (DE # 20) and **GRANTS** plaintiff's motion to seal (DE # 29). The Clerk is **DIRECTED TO ENTER FINAL JUDGMENT** stating:

> Judgment is entered in favor of defendant Indiana University Health Arnett, Inc., and against plaintiff Tamaira Ridge, who shall take nothing by way of her complaint.

**SO ORDERED.**

Date: November 5, 2018

s/James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT